**Kalpana Sharma HERBST, Appellant**

**v.**

**The STATE of Texas, Appellee.**

**No. 09–94–330 CR.**

Court of Appeals of Texas,
Beaumont.

March 12, 1997.

Rehearing Overruled April 3, 1997.

Christine Brown, Orange, for appellant.

John ·Kimbrough, County Attorney, Troy Johnson, Assistant County Attorney, Orange, for appellee.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

1. Act of June 15, 1985, 69th Leg., R.S., ch. 791, § 1, 1985 Tex. Gen. Laws 2703, *amended by* Act of June 14, 1989, 71st Leg., R.S., ch. 904, § 1,

## OPINION

WALKER, Chief Justice.

A jury convicted appellant for the felony offense of endangering a child, said offense having been committed on or about June 21, 1993. Tex. Penal Code Ann. § 22.041(b) (Vernon 1994)[1]. The jury then assessed punishment at eight years' confinement in the Texas Department of Criminal Justice—Institutional Division. Appellant raises six points of error for our consideration.

■ Appellant's first point of error contends the evidence before the jury was legally insufficient to sustain the conviction "because the evidence does not establish that the child was ever in danger or that a reasonable person would have known placing the child there would have placed him in danger of imminent death, bodily injury and physical and mental impairment." The portion of § 22.041 appellant was charged with violating contains the following language:

(b) A person commits an offense if, having custody, care, or control of a child younger than 15 years, he intentionally abandons the child in any place under circumstances that expose the child to an unreasonable risk of harm.

. . .

(e) An offense under Subsection (b) of this section is a felony of the second degree if the actor abandons the child under circumstances that a reasonable person would believe would place the child in imminent danger of death, bodily injury, or physical or mental impairment.

Section 22.041 defines "abandon" as:

(a) In this section, "abandon" means to leave a child in any place without providing reasonable and necessary care for the child, under circumstances under which no reasonable, similarly situated adult would leave a child of that age and ability.

Appellant recognizes the proper appellate standard for reviewing the evidence for legal sufficiency as that announced in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61

1989 Tex. Gen. Laws 3932; Act of June 19, 1993, 73rd Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3587, 3623.

L.Ed.2d 560 (1979), and *Geesa v. State,* 820 S.W.2d 154 (Tex.Crim.App.1991). Such a review for legal sufficiency inquires whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson,* 443 U.S. at 307, 99 S.Ct. at 2781. In *Clewis v. State,* 922 S.W.2d 126, 133 (Tex.Crim.App.1996), the Court of Criminal Appeals characterized a legal sufficiency review as follows:

> A *Jackson* review, "viewing the evidence in the light most favorable to the prosecution," is not a factual sufficiency review; rather, it is an analytical tool used to determine whether there is a fact issue at all. (footnote omitted)

By the express language of § 22.041, the legislature clearly intended to have a "reasonable person," or "objective" standard applied to the conduct in question. *See also* TEX. PENAL CODE ANN. §§ 22.04(d), and 31.11(a)(2)(B) (Vernon 1994). We therefore look at the circumstances then existing through the eyes of a "reasonable, similarly situated adult" (§ 22.041(a)) and through the eyes of a "reasonable person" (§ 22.041(e)) and not to any subjective intent or knowledge on the part of appellant on the evening in question. *See Schultz v. State,* 923 S.W.2d 1, 3, n. 4 (Tex.Crim.App.1996). Through appellant's own testimony, the jury was aware the baby was born on May 29, 1993, and that appellant placed the baby on the side of the road off of Simmons Drive in Orange, Texas on June 21, 1993 between the hours of 9:00 p.m. and 10:00 p.m. Cross-examination by the State elicited the following from appellant:

Q. [State] You told [Trial Counsel] you saw that Shamrock Gas Station right there by the interstate. That you could see it from the place you were?

A. [appellant] Yes, sir.

Q. You probably don't know this but there are some Indian people, I think, that run that gas station.

A. Yes, sir.

Q. Why didn't you just go in the bathroom and maybe leave the baby in the bathroom?

A. Because I didn't—I wanted to leave the baby somewhere.

Q. Okay. You wanted to leave that baby without anybody seeing you leave that baby?

A. Yes, sir.

Q. You agree that if you went to a gas station, you know, maybe somebody would find that baby and say, well, I remember, you know a little white Isuzu Amigo leaving here and some lady coming out of that bathroom and getting into that Amigo?

A. Yes, sir.

Q. You thought about that, didn't you?

A. Yes, sir.

Q. You didn't want anybody to be able to track you down, did you?

A. Yes, sir.

. . .

Q. Let's forget about whether you leave it [the baby] in Texas or whether or not you leave it in Louisiana.

A. Yes, sir.

Q. Let's just say for some reason you decide just to leave the baby out in your front yard in your nice neighborhood over night. Isn't the baby still going to be in danger right out in your front yard overnight?

A. It would be.

Q. You can think about all kinds of reasons, can't you?

A. Yes.

Q. It could rain and the baby could drown from the head being up and the mouth being open?

A. Well, I didn't try to injure the—I didn't try to injure the baby.

The undisputed evidence before the jury was that appellant placed a three-week old baby, of which she had care, custody, and control, on the side of a well-traveled, but very dark, roadway, at approximately 10:00 p.m. in the evening. The baby was strapped into an infant car-seat, and clothed in a dress and diaper. The infant was left entirely without any human supervision, without food or shelter, and completely subject to all of the unpredictable and untamea-

ble elements of nature, including the weather, insects, and wildlife, which could prey on said infant totally unhindered and at any time. Indeed, when the baby was rescued and brought to the hospital for medical attention, the emergency room physician noted many "bug bites" covering most of the exposed areas of the infant's body including his head, face, legs, and parts of the chest.

Under the facts before the jury, we find that any rational trier of fact could have found all of the essential elements of the offense of endangering a child to have been proven beyond a reasonable doubt.[2] Point of error one is overruled.

■ Appellant's second point of error complains the trial court abused its discretion in failing to grant appellant's request for a change of venue. The scope of appellate review on this issue is well settled and was neatly encapsulated in a discussion by the Court of Criminal Appeals in *Willingham:*

> A change of venue is proper and consistent with principles of due process when a defendant demonstrates his inability to obtain an impartial jury or a fair trial at the place of venue. A change of venue is the remedy to jury prejudice resulting from extensive, widespread inflammatory news coverage.
>
> The mere fact that a crime was publicized in the news media does not establish prejudice or require a change of venue per se. Rather, the test is "whether outside influences affecting the community's climate of opinion as to a defendant are inherently suspect." In order to prevail in a motion to change venue, a defendant must prove that publicity about the case is pervasive, prejudicial and inflammatory. A defendant must demonstrate an "actual, identifiable prejudice attributable to pre-

trial publicity on the part of the community from which members of the jury will come."

> When a trial court is presented with a motion to change venue, the trial judge must act as fact-finder with regard to the issue presented. TEX.CODE CRIM. PROC. ANN. Art. 31.04. The trial judge is in a better position than this Court to resolve such issues as a result of his ability to observe the demeanor of witnesses and scrutinize their veracity. Consequently, we will affirm the trial court's judgment absent evidence of an abuse of discretion.

*Willingham v. State,* 897 S.W.2d 351, 357 (Tex.Crim.App.), *cert. denied,* —— U.S. ——, 116 S.Ct. 385, 133 L.Ed.2d 307 (1995) (citations omitted).

In the instant case, a hearing on appellant's motion was held on April 21, 1994. At the conclusion of the hearing, the trial court announced it would withhold its ruling until after voir dire proceedings had taken place. This is permissible in order to help the trial court gauge the "community climate of opinion" as to a defendant. *Black v. State,* 816 S.W.2d 350, 359 (Tex.Crim.App.1991), *cert. denied,* 504 U.S. 992, 112 S.Ct. 2983, 119 L.Ed.2d 601 (1992). However, regardless of the successful qualification of a jury panel, the evidence adduced during the pretrial hearing on the venue motion may dictate that a change of venue be granted in order to assure the accused a fair and impartial trial. *Id.*

At the hearing on appellant's motion, appellant introduced seventeen newspaper articles which had appeared in the Beaumont Enterprise beginning June 23, 1993, the day after the infant was discovered on Simmons Drive, and ending April 1, 1994. Fifteen

---

2. Indeed, the unreasonableness of the conduct which constituted appellant's abandonment of her three-week old infant virtually leaps from the facts testified to. Every human being has experienced personally the complete and utter helplessness of infancy. It is therefore a rather simple exercise, almost instinctual, to place ourselves in the position of a "reasonably, similarly situated adult" regarding the "reasonable and necessary care" of an infant less than one month old. Short of raising mistaken identity, which she does not do, we find no evidence contained in

this record, nor can we conceptualize a credible scenario, which would constitute a defense of or justification for appellant's conduct. Furthermore, all of the evidence regarding the alleged abuse suffered by appellant at the hands of her husband appears to have no relevance for a factfinder whose focus is the objective reasonableness of the conduct in question. (Appellant's sanity was raised by her trial counsel prior to trial but a pretrial psychiatric examination concluded appellant was sane at the time of the offense.)

newspaper articles from the Orange Leader from roughly the same time period were also introduced. The evidence also included a videotape from each of the three local television stations containing news reports of the discovery of the infant in Orange, the subsequent identification of appellant as the suspect, and the separate but related story of the attempt by appellant's husband to gain legal custody of the infant despite the fact he was admittedly not the biological father. Appellant also called nine witnesses. Each testified on direct examination they had formed opinions of appellant's guilt based upon media reports, and that, in their opinion, she was guilty. On cross-examination, however, with only one exception, each witness equivocated to varying degrees as to their opinion of appellant's guilt or whether appellant could get a fair trial in Orange County.

Richard Cupp stated he was only "telling you how I feel" and that he had no idea whether or not, out of eighty thousand Orange County residents, twelve people could be fair and impartial to appellant. Furthermore, Mr. Cupp admitted it had been four to five months since he had discussed the facts with anyone.

The next witness, Lisa Jackson, a dispatcher with the Orange Police Department, admitted on cross-examination that probably no one working for the Orange Police Department could be fair and impartial in this case because they have access to more information about the case than the average person. She conceded that out of eighty thousand Orange County residents twelve fair and impartial people could be found.

Sylvia Ann Myers, residing in Orange, Texas, testified generally that while she and her immediate family, friends, and acquaintances had already made up their minds as to appellant's guilt, she did not know anyone who lived in Vidor or Mauriceville and could not say what those residents thought. Although she did know residents of Bridge City, Orangefield, and Cove, she also could not testify as to their opinions.

Cindy Ferguson was the only witness for appellant who did not equivocate. She maintained her opinion that appellant was guilty and she also felt that, based upon the media coverage and from talking to people at her work in a beauty shop, appellant could not get a fair trial in Orange County.

Doreen Miller, a Vidor resident, stated on cross-examination that if she were a juror and asked to put aside all she had seen, heard and read about the case, she could do that. She further agreed she could hold off deciding appellant's guilt until after she heard all of the facts. She believed a lot of other people could do the same.

Cathy Hagner, a resident of Bridge City, also stated if she were a juror she could base her verdict solely on the evidence presented in the courtroom, and not on her exposure to media coverage. She also believed that out of eighty thousand Orange County residents it would be "logical" that twelve fair and impartial jurors could be found. Ms. Hagner was asked if she felt the media coverage was fair to appellant and she stated she assumed it was.

Ida Schossow of Bridge City stated on cross-examination she would have to hear all of the evidence first before deciding whether or not she could set aside her opinion as to appellant's guilt. When asked if she felt the media coverage was fair to appellant, Ms. Schossow replied that while the media were saying some pretty damaging things about appellant, "I can't say it was slander or not. I think they were just telling the facts that she left the baby there."

The last two witnesses, Donna Robinson and Rachel Nuss, were secretaries to an Orange County criminal defense attorney. The general tone of the cross-examination of both witnesses was that, through their employer, they were privy to certain information, such as "courthouse talk," that the average juror would not be. Furthermore, it was brought out that appellant's trial counsel worked in the same office building as the attorney for which Ms. Robinson and Ms. Nuss worked.

Appellant admitted to the police she left the infant on the side of the roadway in Orange, Texas. Both the television reports and the newspaper accounts of the incident reported these facts. None of the reports, however, appear to have been done in an

inflammatory or malicious way. As the Court of Criminal Appeals has repeatedly noted:

> Our courts cannot and do not operate in a vacuum. Courts deal with people and crimes which are newsworthy. To require a trial of jurors who had never heard of a highly publicized crime would be impractical if not impossible. Certainly, it was never intended that jurors were to be selected from those who did not read newspapers or keep up with current events through other media. Jurors selected from such a group, if there are enough to be called a group, would not be representative. To hold otherwise would be to hold that the perpetrator of a very highly publicized crime such as the assassination of a president, a governor or any widely known person could never be tried.

*Penry v. State,* 903 S.W.2d 715, 731 (Tex. Crim.App.), *cert. denied,* —— U.S. ——, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995) (quoting *Morris v. State,* 488 S.W.2d 768, 772 (Tex. Crim.App.1973)).

Voir dire of the jury took place August 8, 1994, some four months following the hearing on appellant's motion for change of venue. While not entirely clear from the record before us,[3] apparently most, if not all, of the venire had heard of the incident in question. Out of the entire venire panel, it appears only five persons had firm and unequivocal opinions as to appellant's guilt. Each of these persons were excused for cause. The record does not reflect appellant's trial counsel made any further request or had any objection to any of the twelve persons selected as jurors. The record reflects that attorneys for both sides carefully questioned the venire as to prejudicial attitudes stemming from pretrial publicity. The vast majority of veniremembers admitted to having no preconceived opinions of appellant or her guilt. Although the publicity concerning the crime was pervasive, we find appellant has not carried her heavy burden of showing that said publicity was also prejudicial, and inflammatory. We find no abuse of discretion by the trial court in denying appellant's change of venue motion. Point of error two is overruled.

■ Point of error three raises trial court error in failing to grant appellant's motion for mistrial with regard to a newspaper article which appeared the day before testimony was to begin. The record reflects that after swearing in the jury on August 8, 1994, but prior to dismissing the jury for the day, the trial court orally instructed the panel, in pertinent part, as follows:

> I know with the publicity on the case that most likely your families at least are going to know what kind of case you are on. You be sure to tell them now that you don't want anybody to be talking about the case in front of you.

> If someone should try to approach you and talk about the case you tell them no, I don't want to hear a thing about it from anybody except in the courtroom from the witness stand. If anybody should try to do that to you I want you to report that to me.

> . . .

> Another instruction is that you should not attempt to make any investigations whatsoever concerning the case or any of the facts therein. You should not try to go by areas involved or whatever. But you should simply judge this case based upon the testimony that's been brought into the courtroom for you to see and to hear.

The next morning, prior to beginning testimony, the following exchange took place between the trial court, the attorneys, and certain members of the jury panel:

> THE COURT: Good morning, ladies and gentlemen.

> Before we get started this morning I know that there has been again some articles in the newspaper concerning this case. Possibly also on TV.(sic) I need to ask, first of all, ask this morning if there is any

---

**3.** The transcript does not contain a numerical listing of the venire panel members. At points during voir dire, the attorneys for each side identified venire persons either by name or by number, but not always by both. The court reporter merely listed the responding individual as "VENIREPERSON."

juror that may have read the article in the Beaumont Enterprise?

JUROR: (indicating)

THE COURT: Two jurors did. Any jurors that may have seen any TV broadcast concerning —

JUROR: (no response).

THE COURT: In connection with the two jurors that read that article is there anything that you read in the article to affect your ability to be fair and impartial in this case?

JUROR: No.

JUROR: No.

. . .

THE COURT: I would instruct you to disregard anything that you may have seen in the paper or whatever. I think we have covered that pretty completely on Voir Dire. What is in the newspaper is not fact, not sworn testimony, not something that any juror should consider in any matter in connection with the deliberations on the case.

Let me instruct you that to the extent possible I am going to ask that you not read any articles in the paper, not view anything on TV. Now, I understand that occasionally something comes on and you have good intentions to avoid it but cannot and you are exposed to something. In that event I will ask as soon as you realize what it is turn the TV off or leave the room or whatever. If you do hear something that you not consider that as being any evidence or allow that in any way to affect your decision and in fact disregard it totally as if it were uncredible (sic) or unbelievable person making such statements.

Is there anybody on the jury that would have any difficulty at all doing that?

JUROR: (no response).

THE COURT: I take it by your silence that you each could do that. Is the State ready to proceed?

[Trial Counsel]: Your Honor, at this time I would like to make a motion for mistrial.

THE COURT: That's denied.

Appellant's authority under point of error three is taken exclusively from Fifth Circuit cases, with the lead case being *United States v. Aragon*, 962 F.2d 439 (5th Cir.1992). The *Aragon* opinion initially stated that, because the case was a direct appeal from a federal criminal conviction, review by the Fifth Circuit was predicated upon the Court's "supervisory power" over the district courts. *Id.* at 441, n. 1. This "supervisory" designation is significant because in *Murphy v. Florida*, 421 U.S. 794, 797–98, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589, 593 (1975), the Supreme Court explained that when a federal appellate court indicates its ruling is made "[i]n the exercise of [its] supervisory power to formulate and apply proper standards for enforcement of the criminal law in the federal courts," quoting *Marshall v. United States*, 360 U.S. 310, 313, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959), and not as a matter of constitutional compulsion,

> it cannot be maintained that *Marshall* was a constitutional ruling now applicable, through the Fourteenth Amendment, to the States. Petitioner argues, nonetheless, that more recent decisions of this Court have applied to state cases the principle underlying the *Marshall* decision: that persons who have learned from news sources of a defendant's prior criminal record are presumed to be prejudiced. We cannot agree that *Marshall* has any application beyond the federal courts. (footnote omitted).

As we appreciate the language taken from *Murphy*, "supervisory"-type opinions from federal appellate courts have no application to issues arising in state courts. Thus, appellant's authorities setting out the law regarding "mid-trial publicity" cannot be considered by this Court.

At any rate, we believe the integrity of the jury panel was not tainted by the newspaper article in question. The jurors had experienced a voir dire proceeding intensely focused upon the prejudicial effects of extensive pretrial publicity. The only two jurors who read the article in question told the trial court they were not affected by said article. Following this, the trial court painstakingly admonished the panel with regard to any

further media coverage of the trial and expressly instructed the panel to disregard any outside information concerning the trial. We believe this procedure sufficient to ensure appellant a fair trial. *See Powell v. State*, 898 S.W.2d 821, 828 (Tex.Crim.App.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 524, 133 L.Ed.2d 431 (1995).[4] Point of error three is overruled.

■ Appellant's fourth point of error complains of the trial court's failure to grant appellant's motion to suppress the written statement given to authorities, and introduced into evidence as State's Exhibit 4. The trial court held a hearing following impanelment of the jury, but outside the jury's presence. At the conclusion of said hearing, the trial court denied appellant's motion. At trial, when State's Exhibit 4 was tendered for admission into evidence by the State, appellant's trial counsel responded, "No objection." When a pretrial motion to suppress is overruled, the defendant is not required to object at trial to preserve error. *Gearing v. State*, 685 S.W.2d 326, 329 (Tex.Crim.App. 1985). However, the affirmative acceptance of previously challenged evidence waives any right to claim error in its admission. *Jones v. State*, 833 S.W.2d 118, 126 (Tex.Crim.App. 1992), *cert. denied*, 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 678 (1993). No error has been preserved with regard to the admission of State's Exhibit 4. Point of error four is overruled.

■ Point of error five raises the issue of ineffective assistance of trial counsel alleging that trial counsel failed to object to prejudicial hearsay testimony of State's witness Terry Zenner, and that trial counsel failed to request a jury instruction based upon TEX.CODE CRIM. PROC. ANN. art. 38.22, § 6 (Vernon 1979), regarding the voluntariness of appellant's written statement. The record before us reflects appellate counsel filed a Motion for New Trial on September 9, 1994, and a First Amended Motion for New

Trial on September 12, 1994. Neither motion mentioned ineffective assistance of trial counsel as a ground for relief. The trial court overruled appellant's motion for new trial on October 5, 1994, apparently after a brief evidentiary hearing.

The proper standard for determining claims of ineffective assistance under the Sixth Amendment of the United States Constitution is the standard adopted in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In *Strickland*, the Supreme Court announced a two-pronged analysis for claims of ineffective assistance. *Id.* 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. First, appellant must show that counsel performed deficiently. *Id.* Second, appellant must show that the deficient performance prejudiced the defense. *Id.* Appellant must establish these two prongs by a preponderance of the evidence. *Patrick v. State*, 906 S.W.2d 481, 495 (Tex.Crim.App. 1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1323, 134 L.Ed.2d 475 (1996).

■ In the course of attempting to establish the *Strickland* prongs, appellant must additionally rebut the strong presumption that counsel performed competently. *Jackson v. State*, 877 S.W.2d 768, 771 (Tex.Crim. App.1994). Appellant can rebut this presumption by showing counsel's actions were unreasonable under prevailing professional norms and were not sound trial strategy. *Id.* As has been pointed out on numerous occasions, the appellate record must support an ineffectiveness claim, and if there is no evidence to indicate the reasons for trial counsel's allegedly deficient acts or omissions, an appellate court cannot conclude that counsel performed ineffectively. *Id.*; *Delrio v. State*, 840 S.W.2d 443, 447 (Tex.Crim.App.1992); *Johnson v. State*, 691 S.W.2d 619, 627 (Tex. Crim.App.1984), *cert. denied*, 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 152 (1985); *Howard v. State*, 894 S.W.2d 104, 106 (Tex.App.—

---

4. With regard to appellant's complaint that the trial court failed to poll the jury or give appellant an opportunity to poll the jury, the record reflects that trial counsel did not make a request to poll the jury. Furthermore, the Court in *Powell, supra*, pointed out that to poll the jury under such circumstances as occurred in the instant case would be to risk exposing the jury to the existence of the article and its contents for the first time. *Powell*, 898 S.W.2d at 828. The trial court in the instant case handled the situation very delicately and with concern for appellant's right to a fair trial.

Beaumont 1995, pet. ref'd). A silent record does not require us to speculate on the reasons behind counsel's decisions. *Jackson,* 877 S.W.2d at 771; *Howard,* 894 S.W.2d at 106. It must also be remembered that isolated errors alone do not indicate ineffective assistance. *Bridge v. State,* 726 S.W.2d 558, 571 (Tex.Crim.App.1986). No Texas court defines the right to effective counsel as the right to error-free counsel. *Hernandez v. State,* 726 S.W.2d 53, 58 (Tex.Crim.App. 1986). Lastly, all of the above standards are applied by examining, without hindsight, the totality of the representation. *Strickland,* 466 U.S. at 688–89, 104 S.Ct. at 2065, 80 L.Ed.2d at 694; *Garcia v. State,* 887 S.W.2d 862, 880 (Tex.Crim.App.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1368, 131 L.Ed.2d 223 (1995).

At the motion for new trial hearing, the sole witness was appellant. Her testimony was elicited on the issue of allegedly newly discovered evidence (see discussion under point of error six). No complaint was made as to any ineffectiveness of trial counsel's performance during said hearing. With regard to the State's witness Terry Zenner, he was called as a rebuttal witness following appellant's testimony in her case-in-chief. Mr. Zenner testified he was a social worker in private practice in Lafayette, Louisiana. He further stated appellant and her husband, James Herbst, engaged him to do a home study in the course of the Herbst's attempts to adopt appellant's niece. Mr. Zenner testified as to his observations of the Herbsts both individually and as a couple. In the course of Mr. Zenner's testimony, several instances of unobjected-to hearsay did indeed occur which cast James Herbst in a somewhat favorable light. However, without testimony from trial counsel as to what trial strategy he was employing at this stage of the trial, we cannot say that his alleged inaction indicated deficient performance. While we decline to speculate on what trial strategy was involved, *see Jackson,* 877 S.W.2d at 771, we note that, based upon the record before us, the State indicated it would probably call James Herbst as a witness. Immediately following the resting of the defense's case, the State announced that it would not call James Herbst as a rebuttal witness, but instead call Terry Zenner. At this point, trial counsel may have felt that Mr. Herbst would present a more sympathetic witness than Mr. Zenner, a self-described one hundred percent German stoic. Whatever the trial strategy was at that point, we cannot know because trial counsel was not called as a witness at the motion for new trial hearing.

With regard to appellant's alleged failure to request an art. 38.22 jury issue on voluntariness of appellant's written statement, evidence of trial counsel's defense strategy is again absent. Even if the record before us indicated a complete absence of trial strategy as to this alleged deficiency, recall that isolated errors alone do not indicate ineffective assistance. *Bridge,* 726 S.W.2d at 571. Our focus must be the totality of the representation. *Strickland,* 466 U.S. at 688–89, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. The record before us indicates the totality of trial counsel's representation was exemplary given that appellant's only legal "justification" of her actions, insanity, became virtually a non-issue following her examination by Dr. Edward Gripon. Appellant's full, and apparently voluntary, cooperation with authorities during the investigation of the offense placed defense strategies at a premium. Nevertheless, trial counsel filed a variety of pretrial motions firmly grounded in the law and secured hearings and rulings from the trial court when appropriate. From what appears in the record before us, we cannot say appellant has met her burden of showing deficient performance by trial counsel in the course of her defense. Point of error five is overruled.

■ Appellant's final point complains of trial court error in denying appellant's motion for new trial because of alleged newly discovered evidence. As best as we are able to determine from the brief record of the motion for new trial hearing, the alleged newly discovered evidence consisted of harassing and threatening letters written by James Herbst and mailed to appellant. Appellant also claims James Herbst verbally referred to appellant as a "50–cent Hindu."

■ "Where new evidence favorable to the accused has been discovered since trial,"

a new trial shall be granted. TEX.R.APP. P. 30(b)(6).[5] Appellate review of a denial of a motion for new trial based on newly discovered evidence is under an abuse of discretion standard. *Bolden v. State,* 634 S.W.2d 710, 711 (Tex.Crim.App.1982). "Such a denial will not constitute an abuse of discretion unless the record shows (1) the newly discovered evidence was unknown or unavailable to the movant at time of trial, (2) the movant's failure to discover or obtain the evidence was not due to lack of diligence, (3) the new evidence is admissible and is not merely cumulative, corroborative, collateral, or impeaching, and (4) the new evidence is probably true and will probably bring about a different result on another trial." *Wortham v. State,* 903 S.W.2d 897, 899 (Tex.App.— Beaumont 1995, pet. ref'd); *Moore v. State,* 882 S.W.2d 844, 849 (Tex.Crim.App.1994), *cert. denied,* 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995).

In the instant case, the record of the motion for new trial hearing does not contain any of the letters from James Herbst that appellant claims contains the newly discovered evidence. Furthermore, appellant does not make it clear how the contents of the letters would probably bring about a different result in another trial, and are not merely cumulative of her trial testimony of her allegedly abusive relationship with James Herbst. Appellant's brief states: "The letters from Mr. Herbst are extremely relevant to MRS. HERBST's defense. The evidence tends to lend itself to the belief that the Appellant was emotionally battered and did not have any real comprehension that her baby would be in physical danger." This essentially mirrors her trial testimony.[6] Again, the letters are not present in the record before us. It was appellant's duty to provide a complete record for appellate review. TEX.R.APP. P. 50(d). For the above

procedural and substantive reasons, appellant's sixth point of error is overruled. The judgment and the sentence of the trial court are affirmed.

AFFIRMED.

---

5. For current version, *see* TEX.CODE CRIM. PROC. ANN. art. 40.001 (Vernon Supp.1997).

6. Appellant seems to imply she had some sort of justification defense under Chapter 9 of the Texas Penal Code, such as "necessity." *See* TEX. PENAL CODE ANN. § 9.22 (Vernon 1994). The "necessity" defense, however, requires proof of immediate necessity and imminent harm. *Cyr v. State,* 887 S.W.2d 203, 205 (Tex.App.—Dallas 1994, no

pet.). "Imminent harm" occurs when there is an emergency situation, and it is "immediately necessary" to avoid that harm when a split-second decision is required without time to consider the law. *Smith v. State,* 874 S.W.2d 269, 273 (Tex.App.—Houston [14th Dist.] 1994, pet. ref'd). Based on the evidence before us, appellant was clearly not entitled to have "necessity" considered as a "defense" to her actions.