Debbie Ann FLEMING, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–96–285 CR.

Court of Appeals of Texas, Beaumont.

Submitted March 5, 1998.

Decided June 24, 1998.

Rehearing Overruled July 29, 1998.

Christine Brown, Orange, for appellant.

John D. Kimbrough, County Atty., Troy Johnson, Asst. County Atty., Orange, for state.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

## OPINION

WALKER, Chief Justice.

A jury convicted appellant for having committed the felony offense of Murder. Appellant pleaded "true" to a single enhancement count alleging a prior conviction for the offense of Attempted Murder. The jury assessed punishment at confinement in the Texas Department of Criminal Justice—Institutional Division for a term of ninety-nine (99) years. The jury also assessed appellant a fine of $ 5,000. Appellant raises four issues for review, *viz:*

> *Point 1:* The trial court erred in not including in the jury charge the requested charge of self-defense or defense of a third person.
>
> *Point 2:* The trial court abused its discretion in failing to grant appellant's motion for a change of venue.
>
> *Point 3:* The trial court erred in overruling defendant's objection to the State's improper jury argument.

*Point 4:* The trial court abused its discretion in failing to grant appellant's motion for new trial.

Although the sufficiency of the evidence to sustain the conviction is not an issue in this appeal, a brief recitation of the facts is necessary to place appellant's four complaints in proper focus. Further facts will be noted as necessary. On April 17, 1996, at approximately 3:30 p.m., the 16 year old victim, J.M., was shot by appellant as J.M. and six other young men approached appellant's house on foot. The alleged reason for this group's appearance in the street near appellant's house was to "settle" a feud that had been festering for several months between J.M. (and his group of friends) and K.F., appellant's 17 year old son (and K.F.'s group of friends).[1] Although not germane to the issues before us, the act that apparently precipitated the feud was the stealing of a quantity of cocaine or LSD by friends of J.M. from K.F., who was attempting to make a sale of the contraband at the time. Thereafter, approximately three weeks before the shooting in question, K.F. was ambushed by a friend of J.M.'s, D.H., and three other unidentified young men. K.F. managed to run to a friend's house nearby and escape injury. During the chase, however, K.F. observed that D.H. was brandishing a knife. The next day, K.F. related the incident to appellant who reported the incident to the police.

On the afternoon in question, K.F. was at home with appellant when he observed J.M.'s truck drive by the house. The truck had "quite a few people" in it. K.F. watched the truck park up the street. K.F. got scared and pointed out the group to appellant, who had been asleep on the couch at the time. K.F. then instructed appellant that if the group came to the house, "tell them I'm not here." K.F. then went to his room and testified that he was completely unaware of the shooting that occurred only moments later.

■■■ Appellant's initial appellate issue complains of the trial court's refusal to provide a requested jury instruction on either self-defense or defense of a third person. A defendant is entitled to an affirmative defensive instruction on every issue raised by the evidence, regardless of whether it is strong, feeble, unimpeached, or contradicted, and even if the trial court is of the opinion the testimony is not entitled to belief. *See Booth v. State,* 679 S.W.2d 498, 500 (Tex.Crim.App. 1984). If the defensive theory is raised, and the trial court is timely and properly requested to instruct the jury on that theory, the trial court must instruct the jury on the raised defensive theory. *See Thompson v. State,* 521 S.W.2d 621, 624 (Tex.Crim.App. 1974). The jury is the trier of fact, and no one else has the responsibility to decide whether to accept or reject a properly raised defensive theory. *See Id.*

The record reflects appellant timely requested both instructions be provided to the jury. Therefore, we must decide if the evidence raised the issue so as to require the submission of the requested instructions on the use of deadly force in defense of self and in defense of third persons. We note initially that self-defense being a justification, the burden of producing the evidence at trial was on appellant. *See Whiting v. State,* 797 S.W.2d 45, 47 (Tex.Crim.App.1990).

Tex. Pen.Code Ann. § 9.31 (Vernon 1994) provides, in pertinent part:

> (a) Except as provided in Subsection (b), a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force.

Tex. Pen.Code Ann. § 9.32 (Vernon Supp. 1998), which appellant claimed was applicable, provides the following, in pertinent part:

> (a) A person is justified in using deadly force against another:
>
>> (1) if he would be justified in using force against the other under Section 9.31;
>>
>> (2) if a reasonable person in the actor's situation would not have retreated; and

---

1. The record indicates that most of, if not all, of the "friends" of both J.M. and K.F. were either current students of West Orange–Stark High School or recent drop-outs of that school.

(3) when and to the degree he reasonably believes the deadly force is immediately necessary:

(A) to protect himself against the other's use or attempted use of unlawful deadly force[.]

Section 9.33 provides, essentially, that a person is justified in using deadly force to protect a third person when that third person is threatened by circumstances that would entitle the actor to protect himself, and the actor reasonably believes his intervention is *immediately* necessary. TEX. PEN.CODE ANN. § 9.33 (Vernon 1994). Additionally, in *Hamel v. State*, 916 S.W.2d 491, 493 (Tex.Crim. App.1996), the Court reaffirmed their holding that it is not necessary that a jury find the deceased was using or attempting to use unlawful deadly force against a defendant in order for the defendant's right of self-defense to exist, as a person has the right to defend himself from apparent danger to the same extent as he would if the danger were real.

The record before us indicates appellant did not testify during the guilt/innocence phase of the trial. The State introduced a written statement of appellant taken on the day of the shooting by Detective Jessie Romero of the West Orange Police Department. In the statement, appellant denies any knowledge of the shooting. Of the six young men present with the victim when the shooting took place, the State called five to testify to the events they witnessed. The following is reproduced from the testimony of D.H. and is typical of the content of the testimony of the other eyewitnesses:

Q.[State] Okay. Where were you at, do you remember?

A.[D.H.] I was, like, in the middle of the street.

Q. Were you really paying much attention to who was where and stuff like that?

A. No, sir.

Q. What went through your mind when you saw a person you believed to be [K.F.'s] mom come out with that rifle?

A. To run.

Q. Did anything happen before you were able to run?

A. Yes, sir.

Q. What's that?

A. [J.M.] got shot.

Q. All right. How many shots came from that gun?

A. Just one round.

Q. Did the lady you thought was [K.F.'s] mom say anything before the shot was fired?

A. Yes, sir.

Q. Do you remember what that was?

A. She said, "I'm not f'ing around anymore"; and she just shot.

Q. Loud enough to where you-all could hear it?

A. Yes, sir.

Q. Were you-all yelling anything back at her as you-all were walking up the street?

A. No, sir.

Q. Or when you-all saw her come out, let's say, did you yell anything at her?

A. No, sir.

Q. Did you ever see [K.F.]—

A. No, sir.

Q. —at any time that afternoon there around his house?

A. No, sir.

* * * * * * * * * * * *

Q. Okay. You say you saw [K.F.'s] mom then come out with the rifle, and can you get up and explain about how it was that she was holding the gun when you heard the shot?

A. When she come out the door, she had it behind her back and she just brought it over like this and held it down to her waist and she did that and she waved it like this and she just shot.

Q. Okay. So, she, what, waved it back and forth a couple of times?

A. Yes, sir.

Q. Were you able to see what she did after she shot?

A. No. She just went back in the house.

Q. She didn't hang around out there?

A. No, sir.

Q. Didn't come to where you-all were?

A. No, sir.

In her brief, appellant contends "[e]vidence was presented in the present case that Ms. Fleming's son had been chased and attacked by the boys approaching the Appellant's home just a couple of weeks before the incident occurred. [record reference omitted] Based on the testimony at trial, there is no question that Ms. Fleming knew of this attack. Based upon the evidence, the defense of self-defense or defense of a third person should have been included in the jury charge." Appellant provides no other specific record reference in support for her position. We have examined the record before us and find that at the moment appellant fired the fatal shot, there was absolutely no evidence of *immediate* need for the use of deadly force by appellant, while evidence was presented that appellant could have remained inside her house and not gone out onto the porch to confront the young men. Indeed, appellant's son testified appellant had reported the ambush incident to the police, so apparently the police were on notice of trouble between K.F. and the victim's friends. Therefore, based upon the evidence, a more reasonable response to the situation would have been for appellant to stay inside, notify the police, and allow the authorities to deal with the young men. Finally, we observe that appellant's effort to deceive the police during the initial stages of the investigation, culminating in the fabricated statement given to Detective Romero, would seem to indicate *legal* justification for her act was never her state of mind. The trial court did not err in denying appellant's request for the self-defense instructions under the record before us. Issue one is overruled.

Appellant's second issue complains of the trial court's refusal to change venue per appellant's request. The record reflects the trial court conducted a hearing on said request. At the conclusion of the testimony, the trial court ruled it was denying appellant's request at that time but reserved the right to reconsider following the voir dire proceeding. This is permissible in order to help the trial court gauge the "community climate of opinion" as to a defendant. *See Black v. State*, 816 S.W.2d 350, 359–60 (Tex. Crim.App.1991). The record before us, however, reflects that appellant did not raise the issue again either during or following the selection of the jury. This issue was examined recently in another case out of Orange County, *Herbst v. State*, 941 S.W.2d 371 (Tex. App.—Beaumont 1997, no pet.). In Herbst, we quoted extensively from *Willingham v. State*, in which the Court of Criminal Appeals reiterated the law on change of venue as follows:

A change of venue is proper and consistent with principles of due process when a defendant demonstrates his inability to obtain an impartial jury or a fair trial at the place of venue. A change of venue is the remedy to jury prejudice resulting from extensive, widespread inflammatory news coverage.

The mere fact that a crime was publicized in the news media does not establish prejudice or require a change of venue per se. Rather, the test is "whether outside influences affecting the community's climate of opinion as to a defendant are inherently suspect." In order to prevail in a motion to change venue, a defendant must prove that publicity about the case is pervasive, prejudicial and inflammatory. A defendant must demonstrate an "actual, identifiable prejudice attributable to pretrial publicity on the part of the community from which members of the jury will come.

When a trial court is presented with a motion to change venue, the trial judge must act as fact-finder with regard to the issue presented. TEX.CODE CRIM. PROC. ANN. art. 31.04. The trial judge is in a better position than this Court to resolve such issues as a result of his ability to observe the demeanor of witnesses and scrutinize their veracity. Consequently, we will affirm the trial court's judgment absent evidence of an abuse of discretion.

*Herbst*, 941 S.W.2d at 374 (quoting *Willingham v. State*, 897 S.W.2d 351, 357 (Tex.Crim. App.1995) (citations omitted)).

In support of her motion, appellant called four witnesses: her then ex-husband; a friend of appellant; appellant's son; and finally the victim's father. The reasons given by appellant's ex-husband for his belief that appellant could not get a fair trial in Orange

County was based upon his perception of newspaper coverage depicting appellant as having "ambush[ed]" the young men, as well as the "prominence" of the victim's family in the Orange County community. Appellant's friend testified that the prominence of the victim's family and "the longevity of [the victim's family] being here in Orange County" were her reasons for believing appellant could not get a fair trial in Orange County. Appellant's son was not asked his opinion regarding appellant's chances of a fair trial in Orange County because appellant's attorney chose to question him on the variety and severity of threats he [appellant's son] had received since the shooting. Finally, the victim's father was called by appellant in an apparent attempt to show that he and his family were indeed prominent in Orange County. However, the father testified he belonged to no professional associations or clubs, did not belong to the Rotary or Lions Clubs, did not participate in any civic activities or civic affairs in any capacity, held no positions in his church, and did not consider himself "anything special" in comparison to any other citizens of Orange County. His testimony indicated that his only "claim to fame" was that he was a local pharmacist who admitted knowing "a lot of people."

The motion to transfer venue included newspaper articles from the Beaumont Enterprise and the Orange Leader. The articles indicated, among other things, that appellant had previously served penitentiary time for two drug related convictions as well as for an attempted murder charge dating back to 1981. The "classified" section of the July 7, 1996, edition of the Orange Leader depicted six small box-like ads placed by the victim's family thanking the police, the district attorney's office, the hospital staff, the doctors, two local churches, a local funeral home, and a local cemetery for help and support following the death of the victim.

In her brief, appellant's focus regarding any unfair or inflammatory pretrial publicity is on the six classified ads and the articles depicting appellant's prior criminal history. As for appellant's prior criminal history, none of the witnesses mentioned this as a factor in their belief that appellant could not receive a fair trial in Orange County. Additionally, none of the members of the venire that admitted to having read or heard anything about appellant and the incident in question mentioned having read or heard about appellant's criminal history. The alleged prominence of the victim's family was fleshed out a bit more by the parties, but its significance basically boils down to the fact that the victim's father was a fairly well-known pharmacist. The evidence does not, however, raise him to the status of a celebrity in the community, or to the level of an elected official whose name and/or visage is placed before the public at regular intervals. The record of the voir dire proceeding reflects that three venire members knew the victim's father and two knew the victim's older brother. None of the three venire members who knew the victim's father had their knowledge of him based on his work as a pharmacist. The two members who knew the victim's brother did not appear to have based their acquaintance on close, personal contact with him or the family. All five venire members expressed the fact that they could render a fair and impartial verdict despite their familiarity with the victim's family.

■ The record before us reflects that the publicity of the instant offense and of appellant was neither pervasive nor inflammatory. Apparently anticipating the issue to be raised, the issue of self-defense was placed before the venire. The vast majority of venire members admitted to having no preconceived opinions of appellant or her guilt. Because we find that the publicity surrounding the incident was not pervasive, prejudicial, or inflammatory, appellant has failed to carry the heavy burden required for a change of venue. The trial court did not err in denying appellant's request. Appellant's second issue is overruled.

Appellant's third complaint centers on a portion of the State's final remarks to the jury at the guilt/innocence phase of the trial. The record reflects the trial court instructed the jury on the law of murder, manslaughter, and criminal negligence. As the State was attempting to summarize the evidence and apply it to the three offenses provided to the jury, the following took place:

[The State] Now, finally, criminal negligent homicide. That's when she should be aware of the risk, but she's not. And criminal negligent homicide sounds terrible. Criminal. You know, homicide. But the key to that is negligent. Negligence is if you're driving your car too fast in the rain and you lose control and you hit somebody. That's negligence. Criminal negligent homicide, is, like, if you fire a shot at a bird on the wire and the bullet goes on and hits somebody and kills them. Yeah, you ought to be aware—but you're probably not—that if you miss that bird and the bullet keeps going it's going to hit somebody. You should be aware of that but if you're not and somebody gets killed, that's criminal negligence [sic] homicide. It's just negligence. There's not much to it. You know, if she's on the porch and got the gun and got it—and somebody opens the door and bumps her arm and, you know, the gun somehow terribly goes off, that's negligence. You know, she should be aware if she's got that gun pointed at somebody something like that door opening up and bumping her could happen but she's not—that's negligence. That's two years maximum. Folks, that's nothing. That doesn't apply in this case.

[Trial Counsel]: Your Honor—Your Honor, I object to him talking about punishment at this point when it's guilt/innocence. I object to it.

THE COURT: All right. I'll sustain the objection.

[Trial Counsel]: Your Honor, I'd ask the jury to be instructed to disregard.

THE COURT: The jury is instructed to disregard the comment of the prosecutor. I've previously instructed you, ladies and gentlemen, you're not to consider the punishment, if any, that may be assessed during this phase of the trial.

[Trial Counsel]: Again, Your Honor, I must ask for a mistrial at this point.

THE COURT: That's denied.

[The State]: If she's holding a gun and that dog that barked at Chief Simpson comes up (counsel barking) and whoa, that's negligence, folks. That isn't the case with [J.M.] getting killed. I want to tell you-all that right now, but you-all are the jury. You-all get to decide. I'm just making these arguments because that's one of your options.

Appellant relies on *McClure v. State,* 544 S.W.2d 390 (Tex.Crim.App.1976), for the proposition that it is improper for the State to tell the jury the penalty range during the guilt/innocence phase of a trial. At oral argument in the instant case the State indeed conceded the impropriety of the remark. Appellant, to her credit, recognizes the general rule in her brief that any harm from such a remark is normally cured with a prompt instruction by the trial court to disregard. Our research into this issue has turned up four cases from separate Texas appellate courts involving very similar remarks from the State during closing argument at the guilt/innocence phase. *See Trent v. State,* 925 S.W.2d 130, 132–33 (Tex.App.—Waco 1996, no pet.); *Bruton v. State,* 921 S.W.2d 531, 535–36 (Tex.App.—Fort Worth 1996, pet. ref'd); *Ewers v. State,* 826 S.W.2d 173, 174–75 (Tex.App.—Corpus Christi 1991, no pet.); *Powers v. State,* 757 S.W.2d 88, 94 (Tex.App.—Houston [14th Dist.] 1988, pet. ref'd). In each case, the defendant objected to the State's disparaging remark directed to a lesser-included offense contained in the written instructions to the jury. In three of the four cases cited above, *McClure* was explicitly relied upon by the defendant on appeal. Typical of the discussions by the courts was that of Chief Justice Nye in *Ewers,* which we reproduce as follows:

> Appellant relies on *McClure v. State,* 544 S.W.2d 390 (Tex.Crim.App.1976) for the proposition that the State's reference to the lesser included offense as a misdemeanor was improper and constituted reversible error because that information was not in the charge. We disagree. The prosecutor in *McClure* continually stressed the penalty differences between the misdemeanor and felony offenses. Such references permeated his closing argument. The *McClure* argument was improper because "it was a plea to the jury to consider the amount of punishment, rather than the facts, in determining the offense for which appellant should be convicted." Here, the

prosecutor did not argue that the difference in the level of the offenses should be used as a criterion for determining guilt.

*Ewers,* 826 S.W.2d at 174.

■ As alluded to previously, the general rule is that an instruction to disregard an objectionable comment will normally obviate the error, unless the remark is so inflammatory that its prejudicial effect cannot reasonably be removed by such an admonishment. *Dinkins v. State,* 894 S.W.2d 330, 357 (Tex. Crim.App.1995). In the instant case, while the State's remark regarding criminal negligent homicide, "That's two years maximum. Folks, that's nothing[,]" was improper, we find that it was not so inflammatory that its prejudicial effect could not have been cured by the trial court's prompt and very specific instruction to the jury to disregard. Indeed, immediately after the objection was made, the State resumed its final argument by remarking that the issue was for the jury to decide, "You-all get to decide. I'm just making these arguments because that's one of your options." The State's improper remark was not emphasized, was not continually stressed, and did not permeate its final argument as was the case in *McClure.* We find, therefore, that the State's improper remark was cured by the trial court's instruction to disregard. Appellant's third issue is overruled.

Appellant's final complaint focuses on the trial court's denial of appellant's motion for new trial following an evidentiary hearing. The basis for the motion was an allegation of newly discovered evidence. A new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial. TEX.CODE CRIM. PROC. ANN. art. 40.01 (Vernon Supp.1998). Two witnesses testified at the hearing, appellant and appellant's step-daughter, Misty Harrison. Appellant testified that she learned *after* the trial that one of the seven young men she observed approaching her house moments before the shooting had a gun. The pertinent testimony is somewhat confusing so we reproduce it as follows:

Q.[State] And to get this straight, you learned after the trial that one of the—how many was it, six young men walking up your street?

A.[appellant] Seven.

Q. Seven. One of those seven walking down the street towards your house, you've learned since the trial that one of them had a gun?

A. That day I learned they had it, but I knew they had the gun before then because my daughter knew them.

Q. But let me just get this straight. On—what was it, April the—

A. 17th.

Q. —17th of 1996, this year—

A. I knew they had the gun but I didn't know they had it with them that day but I knew that they were violent anyhow.

Q. All right. So, you're saying on that day while they're walking toward your house and you're watching them, you knew they probably had a gun?

A. Yes.

Q. And then later that same day after the shooting is when you found out for sure that they did have the gun?

A. No. I didn't find that out for sure until my daughter seen them in court. She knew them.

The pertinent portion of Ms. Harrison's testimony is reproduced as follows:

Q.[Appellate Counsel] At the close of the trial, did you relay some information to Ms. Fleming after the trial was over that was relevant at the trial?

A.[Ms. Harrison] Well, the last day of her trial I realized that one of the boys that was here was—we had sold a gun to, and I didn't know that until that day.

Q. And at that—until that point did you realize that this was a relevant piece of information or even remember this information?

A. No, I didn't know it was relevant until that day.

Q. Could you please tell me a little bit about the sale of the gun. When did it occur?

A. It happened maybe three weeks before the shooting had happened. One of the boys, [R.G.], had came over with a

friend to me and my fianc's house—over to my house where we used to live and wanted to buy a gun and my fianc had a—I guess this little .25 gun and he wanted it. So, we sold it to him. I thought—we thought he was my age at the time. I was 22.

Q. You were 22 at the time?

A. Yeah.

Q. Was it only at a later point that you found out that he wasn't?

A. Yes.

Q. And did you realize this prior to the close of the trial?

A. Yeah, pretty much, I guess you could say that. You know, at the time I realized that he was one of the boys that was messing with [K.F., appellant's son] and found he was underage and, you know—

Q. Was this right close to the time of the shooting?

A. Pretty much, yes, like three weeks before.

Q. So, it was a very short time before?

A. Yeah.

Q. And you were present at the time when the gun was sold?

A. Yes.

Appellant argues that this evidence, had it been known by appellant at the time of trial, could have been presented to give "credence to the defense of self-defense[.]" However, as we appreciate the Court's holding in *Hamel v. State,* referred to in our discussion of appellant's first issue, a person has the right to defend herself from "apparent danger" to the same extent as she would if the danger were real; and the term "reasonably believes" in § 9.32 encompasses the traditional holding that a defendant is justified in defending against a danger as *she* reasonably apprehends it. *Hamel,* 916 S.W.2d at 493. Appellant testified at the motion for new trial hearing that *at the time of the shooting* she knew that one or more of the young men "probably" had a gun. She only learned *after trial* that a friend of the young men had purchased a gun from her step-daughter's fianc weeks before.

The above testimony regarding the sale of the gun to R.G. two to three weeks prior to the shooting, and the fact that R.G. was a close friend of the young men who were friends of the victim, even if taken as true, is of no help to appellant's case *vis-a-vis* her claim of self-defense in that it still provides absolutely no evidence of appellant's subjective belief of any real or apparent danger present at the time of the shooting. Indeed, the testimony of appellant and of Ms. Harrison is completely to the contrary. Clearly, appellant was unaware of this information until *after* the trial, and certainly not aware of it on the day of the shooting. Furthermore, the testimony does not indicate that any of the seven young men were in possession of the gun in question and brandishing said weapon so as to be visible to appellant or any other witness so as to provide objective evidence of immediate danger. For purposes of § 9.32, appellant's subjective knowledge of the existence of any real or apparent danger *acquired after the fact* cannot have any relevance to what she may have "reasonably believed" to be real or apparent danger when the shooting occurred. Furthermore, the person who allegedly purchased the gun, R.G., was not one of the seven young men present outside of appellant's house when the shooting took place. We find that under the provisions of Tex. Code Crim. Proc. Ann. art. 40.01, the trial court did not err in denying appellant's motion for new trial as the alleged newly discovered evidence was, under the facts and circumstances of the case, not material. Appellant's final issue is overruled. The judgment and the sentence of the trial court are affirmed.

AFFIRMED.