NUMBER 13-07-00127-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


JOSE MANUEL LOPEZ, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 357th District Court of Cameron County, Texas.


 


MEMORANDUM OPINION



Before Justices Rodriguez, Garza, and Benavides


Memorandum Opinion by Justice Garza


 A jury convicted appellant, Jose Manuel Lopez, (1) of two first-degree felony counts
of aggravated sexual assault of a child and one second-degree felony count of indecency
with a child, and it assessed as punishment three terms of confinement for twenty, eight-and-one-half, and four years for each count, respectively. See Tex. Penal Code Ann. §
21.11 (Vernon 2003), § 22.021 (Vernon Supp. 2008). The trial court signed a judgment
of conviction and sentence according to the jury's verdict and assessment and ordered the
imposed sentences to run concurrently. By two issues, Jose contends that: (1) the
evidence is factually insufficient to support his conviction; and (2) the trial court abused its
discretion by denying his motion for a mistrial at punishment based upon mid-trial publicity. 
We affirm.

I. Background (2)

A. Before the Alleged Incident 

 K.L. is the daughter of Jose's brother. Although her mother and father were married
when the incident occurred, the couple had been separated for years and informally shared
custody of K.L. During the school year, K.L. lived with her mother in Baytown, Texas, and
she spent summers with her father and her paternal family members in Brownsville, Texas. 
In February 2004, K.L., who was then thirteen years old, attempted to run away with her
boyfriend. K.L.'s mother immediately sent K.L. to live with her father because she wanted
to keep K.L. away from her boyfriend.

 At that time, K.L.'s father did not have an established residence. Therefore, her
father asked Jose if he and K.L. could live with Jose and his wife, Tina Lopez, in their two
bedroom, two bathroom condominium in Rancho Viejo, Texas. Jose and Tina obliged. 
K.L. was given her own bedroom in the condominium, and her father either slept on the
couch in the living room or at his mother's house. After K.L. moved in with Jose and Tina,
she enrolled in middle school. But, K.L. did not have many friends outside of Baytown and
was not involved in extracurricular activities when she lived in Rancho Viejo. K.L. missed
Baytown and frequently telephoned her mother, boyfriend, and A.C., her cousin. 

B. The Alleged Incident

 K.L. testified that on the morning of Friday, April 23, 2004, she woke up with a cold 
and told her father, Jose, and Tina that she was not feeling well and was going to stay
home from school. K.L. went back to sleep, then woke up around 10 or 11 a.m. to find that
her father and Tina had left. Jose offered K.L. "a penicillin pill," asked if she wanted to
watch a movie in Jose and Tina's bedroom, and suggested that K.L. take a shower
because she was feeling hot. K.L. testified that she showered, put on a pair of underwear,
green athletic shorts, and a t-shirt, and went into Jose and Tina's bedroom to watch the
movie. At first, K.L. watched the movie from the bed while Jose sat on a couch in the
bedroom. K.L. stated that about ten minutes into the movie, Jose moved onto the bed, laid
next to her, smelled her hair, and caressed her arms. K.L. further stated that Jose then put
his hands underneath her shorts, inserted a finger into her vagina, and moved it. K.L. also
stated that: (1) Jose put her hand on his penis; (2) she could feel through his clothes that
it was hard; and (3) she moved her hand away. According to K.L., Jose then took off her
shorts and underwear and his pants and inserted his penis into her vagina and "like,
started humping me." When Jose stopped, he went into the bathroom. K.L. felt like she
had "peed herself" and noted that when she felt her private area, she felt "really sticky." 
She put her shorts on and went into the kitchen. Shortly thereafter, K.L. encountered Jose,
and he told her "don't tell anyone or I'm going to have to kill myself." Jose took the
cordless telephone from the living room into his bedroom. K.L., therefore, could not call
for help.

C. After the Alleged Incident

 After the alleged incident, Tina returned home and then ran an errand with Jose and
K.L. When the three returned, K.L. asked Tina for permission to use the telephone, and
K.L. called her boyfriend in Baytown, but he was not there. That evening, K.L. called her
mother, and the two spoke for only five minutes. The next day, Jose and Tina left for
Victoria, Texas, and K.L. spent Saturday and Sunday with her father and Omar Rodriguez,
a family friend. At 2:30 a.m. on Sunday, April 25, 2004, K.L. again attempted to call her
boyfriend, but instead, spoke to her boyfriend's sister, whom K.L. knew as a friend. K.L.
told her boyfriend's sister about the alleged incident. Later on Sunday morning, K.L.
recounted the alleged incident to A.C. and K.L.'s aunt. On Sunday, April 25, 2004, K.L.'s aunt relayed K.L.'s allegations to K.L.'s mother,
who then telephoned K.L. After speaking with K.L., her mother asked her father to put K.L.
on a plane to Houston, Texas. Around 9 or 10 p.m. that evening, K.L. arrived in Houston,
and according to her mother, she looked "scared" and "kind of nervous." K.L.'s mother
took K.L. to a Houston area hospital, where K.L. was examined by a physician, had a rape
kit performed, and gave a videotaped interview to a forensic interviewer. 

 At approximately 1 a.m. the next day, K.L.'s mother spoke to a Rancho Viejo patrol
officer. The officer advised her to save any clothing that K.L. might have worn during the
incident and send it to the police department. In August 2004, K.L.'s mailed a pair of green
shorts to the police department that K.L. had allegedly worn on the day of the incident. (3) 

 Later, K.L. wrote a note stating the following: "I want a [sic] 35 million to 2 say
nothin happen [sic]." At trial K.L. explained that:

 A. I was in the car with my dad and he was telling
me that [Jose's] lawyers was [sic] asking him to
convince me to just say--write a note or write a
letter to say nothing happened. The other
lawyers, not you all, I don't think. I don't know.


 And I was like--like, he kept harassing
me about it saying that I needed to write it down. 
I need to write it down, when I was going to write
it down and? [sic] The day he came to see me
in, I don't know, this last--I think it was around
December or January, he told me that [Jose's]
lawyers was [sic] going to take--clear my record
and that they were going to--what, they were
going to give me money or something if I wrote
down somewhere that I said nothing happened.


 Q. [Defense counsel] So you're saying that your dad . . . made you
write that?


 A. Yes.


 Q. Okay, but my question still was: After you wrote
it, what did you do with it?


 A. He [her father] got it. I had wrote it on the middle
thing of the truck, like the--that thing that comes
up and down. And I left--after I finished writing
it, he got it and put it in his pocket.


 . . . .


 A. Well, because I already knew that that wasn't
going to be able to stop it because the State had
already picked up the case. It wasn't up to me if
I say that it's going to drop automatically. So I
was just saying--I just wrote that so he could get
off my back about it and leave me alone.


Both K.L. and her mother testified that K.L.'s father rarely visited K.L., and K.L.'s mother
stated that K.L.'s father pressured her to drop the charges against Jose.


D. Forensic Evidence

 After the Rancho Viejo police department received the green shorts, the item was
sent to a Department of Public Safety (DPS) laboratory for analysis. Edna Zavala, a DPS
forensic scientist, testified that she performed a polylight test on the inside of the shorts,
and the test did not reveal any semen stains. Zavala then tested the crotch area for acid
phosphatase, a chemical commonly found in semen. Acid phosphatase was detected on
a portion of the crotch area. 

 Next, Zavala ran a DNA profile on samples collected from the crotch area of the
green shorts and determined that it contained epithelial cells from K.L. and sperm cells
from an unknown male. Rancho Viejo police obtained a search warrant for a sample of
Jose's blood, successfully collected a sample, and forwarded it to the DPS laboratory. 
Zavala testified that "[t]he DNA profile obtained from the sperm cell fraction of the semen
stain on the [green] shorts is consistent with the DNA profile of [Jose]. [Jose] cannot be
excluded as the contributor of the stain." (4) However, on cross examination, Zavala admitted
that the "stains" she described were not visible to the naked eye and that a concentrated
stain on a pair of shorts would be diluted by washing the shorts.

E. Jose's Defense

 Omar, Tina, and Ninfa Leticia Lopez, Jose's sister-in-law, testified that K.L.
appeared "fine" in the hours and days after the alleged incident. Tina testified that K.L.
seemed sad when she lived with her and Jose because she had no friends in Rancho Viejo
and missed her boyfriend in Baytown. 

 Tina's testimony directly or indirectly contradicted K.L.'s testimony in that Tina
testified to the following: (1) on the afternoon of Friday, April 23, 2004, Tina, Jose, and
K.L. did not leave the house to run errands, but instead, went to a family member's house
for dinner; (2) K.L. had a telephone in her bedroom that she could freely use; (3) on
Saturday, April 24, 2004, K.L. wanted to accompany Jose and Tina to Victoria, Texas; (4)
Tina did all the housework, including the laundry, and K.L. did not do very much
housework; and (5) the Rancho Viejo Police Station was within one hundred feet of the
condominium. Tina further testified that on the morning of the alleged incident, she
performed oral sex on Jose before discovering that K.L. had stayed home from school. At
a different point in Tina's testimony, she stated that she would clean off Jose's semen with
a wet towel, which she put in the household's laundry basket and which was washed with
the rest of the household's dirty laundry, including K.L.'s clothing.

F. Post-Verdict Motion and Punishment

 The jury charge contained two first-degree felony counts of aggravated sexual
assault of a child and one second-degree felony count of indecency with a child. See id.
§§ 21.11, 22.021. On October 19, 2004, the jury found Jose guilty on all counts. The trial
court accepted the jury's verdict and set the punishment phase of trial for October 30,
2004. 

 At the punishment phase of trial, Jose's counsel orally moved for "a mistrial at
punishment" on the ground that publicity would adversely affect the jury's assessment. 
Specifically, Jose pointed out that David Dewhurst, a candidate for lieutenant governor, ran
a television commercial publicizing his support for "Jessica's Law," a legislative measure
that imposed mandatory twenty-five-year prison terms for individuals convicted of child
molestation (hereinafter "the Dewhurst commercial"). John Wesley Kittleman, general
manager of an ABC television affiliate, testified that the commercial aired thirty-eight times
on his station between October 20 and October 29, 2004. The trial court denied Jose's
motion.

 During the punishment phase of trial, the State called: (1) D.S., a woman who
claimed Jose raped her in 1977; (2) N.J., a woman who claimed she had sexual relations
with Jose when she was fourteen years old and gave birth to his child; (3) Officer Loray
Taylor, a San Marcos police officer who claimed Jose was arrested on marihuana
possession charges in 2001; and (4) Chris Lawrence, a patrol deputy with the Kleberg
County Sheriff's Department who arrested Jose for illegal possession of marihuana after
pulling Jose over for various traffic violations on November 14, 1995. Jose did not testify,
but he called two of his children and Belinda Guerra, a longtime family friend, to testify as
to his good nature. The jury assessed as punishment three terms of confinement for
twenty, eight-and-one-half, and four years for each count, respectively. The trial court
signed a judgment of conviction and sentence according to the jury's verdict and
assessment. The trial court certified Jose's right to appeal on February 21, 2007. This
appeal ensued.

II. Factual Sufficiency

 In his first issue, Jose challenges the factual sufficiency supporting his conviction. 
Specifically, Jose contends that: (1) K.L.'s testimony was not credible because she
fabricated the alleged incident in order to return home and because she requested $35
million in exchange for dropping the charges against Jose; (2) Tina's testimony regarding
her sex life with Jose and the disposal of Jose's semen greatly outweighed the forensic
evidence supporting Jose's conviction; and (3) Ninfa's, Rodriguez's, and Tina's testimony
about K.L.'s demeanor after the alleged incident further outweighed K.L.'s testimony. Jose
argues that for the forgoing reasons, the jury's determination of guilt is manifestly unjust.

A. Standard of Review

 When reviewing the factual sufficiency of the evidence to support a conviction, we
view all the evidence in a neutral light, favoring neither party. Neal v. State, 256 S.W.3d
264, 275 (Tex. Crim. App. 2008); Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim. App.
2006). We then ask whether the evidence supporting the conviction, although legally
sufficient, is nevertheless so weak that the fact finder's determination is clearly wrong and
manifestly unjust or whether conflicting evidence so greatly outweighs the evidence
supporting the conviction that the fact finder's determination is manifestly unjust. Lancon
v. State, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008); Watson, 204 S.W.3d at 414-15,
417. To reverse under the second ground, we must determine, with some objective basis
in the record, that the great weight and preponderance of all the evidence, though legally
sufficient, contradicts the verdict. Watson, 204 S.W.3d at 417.

 In determining whether the evidence is factually insufficient to support a conviction
that is nevertheless supported by legally sufficient evidence, it is not enough that this court
"harbor a subjective level of reasonable doubt to overturn [the] conviction." Id. We cannot
conclude that a conviction is clearly wrong or manifestly unjust simply because we would
have decided differently than the jury or because we disagree with the jury's resolution of
a conflict in the evidence. Id. We may not simply substitute our judgment for the fact
finder's. Johnson v. State, 23 S.W.3d 1, 12 (Tex. Crim. App. 2000); Cain v. State, 958
S.W.2d 404, 407 (Tex. Crim. App. 1997). Unless the record clearly reveals that a different
result is appropriate, we must defer to the jury's determination of the weight to be given
contradictory testimonial evidence because resolution of the conflict "often turns on an
evaluation of credibility and demeanor, and those jurors were in attendance when the
testimony was delivered." Johnson, 23 S.W.3d at 8. Thus, unless we conclude that it is
necessary to correct manifest injustice, we must give due deference to the fact finder's
determinations, "particularly those determinations concerning the weight and credibility of
the evidence." Id. at 9. Our deference in this regard safeguards the defendant's right to
a trial by jury. Lancon, 253 S.W.3d at 704.

B. Analysis

 First, Jose contends that K.L.'s testimony is not credible because she wished to
return to Baytown and her boyfriend, and she fabricated the allegations against Jose in
order to return. As evidence of K.L.'s duplicity, Jose points to the testimony of Rebecca
Girardet, M.D., a pediatrician at the Children's Assessment Center who performed a rape
kit examination on K.L. On cross examination by Jose's counsel, Dr. Girardet testified that
K.L. did not tell her that Jose ejaculated inside her or that "something came out." At trial,
however, K.L. testified that when Jose stopped the assault, she felt like she had "peed
herself" and noted that she felt "really sticky." 

 Jose also argues that K.L.'s note demanding $35 million in exchange for dropping
the charges undermines the "veracity of her allegations." However, K.L. testified that her
father pressured her to write the note. In addition, K.L.'s mother corroborated K.L.'s
testimony about K.L.'s father's insistence that the charges against Jose be dropped. 

 Second, Jose contends that the DNA evidence presented by the State does not
"shore up" K.L.'s testimony. Jose highlights Tina's testimony that: (1) she and Jose
enjoyed a vibrant sex life; (2) she customarily cleaned up Jose's ejaculate with a towel and
threw the towel in the household's laundry pile; and (3) she washed all of the household's
laundry together. Jose posits that his DNA transferred onto the shorts that were tested
while they were in the laundry together. Additionally, Jose contends that the DNA evidence
should be discounted because neither K.L.'s mother nor K.L. adequately explained why the
shorts were not turned over to the police department until August 2004, even though the
incident allegedly occurred in April 2004. On the other hand, K.L. testified that she did her
own laundry and never washed her clothes with Jose's clothes. Regarding the delay in
sending the shorts to the police, K.L.'s mother explained on cross examination by Jose's
counsel that she was very busy. We note that Jose did not present any positive testimony
regarding his "DNA transfer theory," and that the bulk of the theory was advanced or
suggested by questions from Jose's counsel to Zavala. 

 Third, Jose notes that several defense witnesses testified that K.L. appeared "fine"
after the alleged incident and that K.L. wanted to accompany him and Tina to Victoria,
Texas, the day after the incident. He contends that these two pieces of evidence
contradict K.L.'s trial testimony and outweigh the evidence supporting his conviction. K.L.,
however, testified as to the incident and K.L.'s mother testified that K.L. looked "scared"
and "kind of nervous" when she first saw her after the alleged incident.

 All of Jose's factual sufficiency arguments touch on the jury's role as the fact finder. 
The jury is the sole judge of the weight and credibility of the evidence and is entitled to
resolve conflicts in the evidence. See Tex. Code Crim. Proc. Ann. art. 36.13 (Vernon
2007); Johnson, 23 S.W.3d at 7. The jury was thus entitled to: (1) weigh K.L.'s trial
testimony over her interview with Dr. Girardet regarding the incident and whether Jose
ejaculated; (2) weigh the significance of K.L.'s note demanding $35 million in exchange for
dropping the charges against Jose over testimony indicating K.L.'s father's pressuring of
K.L. and K.L.'s mother to drop the charges; (3) disbelieve the "DNA transfer theory"; and
(4) disbelieve the defense witnesses regarding K.L.'s demeanor in light of K.L's testimony
about the incident and K.L.'s mother's testimony about K.L.'s demeanor after the alleged
incident. 

 After considering Jose's contentions and the evidence as a whole, we cannot say
that it is so weak or that the conflicting evidence so greatly outweighs the evidence
supporting the conviction that the jury's verdict was clearly wrong and manifestly unjust. 
Lancon, 253 S.W.3d at 704; Watson, 204 S.W.3d at 414-15, 417. Accordingly, we hold
that the evidence is factually sufficient to support Jose's conviction, and we overrule Jose's
first issue.

III. Motion for Mistrial

 In his second issue, Jose contends that the trial court erred in denying his motion
for a mistrial at the punishment phase because the Dewhurst commercial was aired by a
local television station and there was a high probability that it influenced the jury and
denied him a fair trial. The State contends that Jose waived his second issue by not
requesting an instruction from the trial court. We agree.

 To preserve error for appellate review, an appellant must raise the complaint in the
trial court in a timely request, objection, or motion stating the grounds for the objection. 
Tex. R. App. P. 33.1(a). The usual sequence for pursing an objection to an adverse ruling
is (1) objection, (2) instruction to disregard, and (3) motion for mistrial, but:

 this sequence is not essential to preserve complaints for appellate review.
The essential requirement is a timely, specific request that the trial court
refuses. . . . Similarly, the request for an instruction that the jury disregard
an objectionable occurrence is essential only when the [sic] such an
instruction could have had the desired effect, which is to enable the
continuation of the trial by a [sic] impartial jury. The party who fails to
request an instruction to disregard will have forfeited appellate review of that
class of events that could have been "cured" by such an instruction. But if
an instruction could not have had such an effect, the only suitable remedy
is a mistrial, and a motion for a mistrial is the only essential prerequisite to
presenting the complaint on appeal. . . . Accordingly, when a party's first
action is to move for mistrial . . . the scope of appellate review is limited to
the question whether the trial court erred in not taking the most serious
action of ending the trial; in other words, an event that could have been
prevented by timely objection or cured by instruction to the jury will not lead
an appellate court to reverse a judgment on appeal by the party who did not
request these lesser remedies in the trial court. Limited as this scope of
appellate review may be, such an appellate review is available to such a
party.


Young v. State, 137 S.W.3d 65, 69-70 (Tex. Crim. App. 2004) (emphasis added) (footnotes
omitted). 

 In most cases, a trial court's instruction to disregard any outside information
concerning the trial is sufficient to ensure a fair trial. Herbst v. State, 941 S.W.2d 371,
377-78 (Tex. App.-Beaumont 1997, no pet.) (citing Powell v. State, 898 S.W.2d 821, 828
(Tex. Crim. App. 1994) ("A presumption of prejudice does not arise simply because a case
has been publicized in the media . . . .")). Only extreme circumstances, when the prejudice
is incurable, require a mistrial. Hawkins v. State, 135 S.W.3d 72, 77 (Tex. Crim. App.
2004) (citing Simpson v. State, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003) ("The trial
court is required to grant a motion for a mistrial only when the improper [action] is clearly
prejudicial to the defendant and is of such character as to suggest the impossibility of
withdrawing the impression produced on the minds of the jurors.")). 

 In Ladner v. State, the Tyler Court of Appeals held that in determining whether
outside news media information is possibly prejudicial, the trial court must: (1) "look at the
nature of the news material in question to determine whether it is innately prejudicial;
factors such as the timing of the media coverage and its possible effects on legal defenses
are to be considered"; and (2) "ascertain the likelihood that the publicity has in fact reached
the jury." 868 S.W.2d 417, 423 (Tex. App.-Tyler 1993, pet. ref'd). The Ladner court
further noted that "[e]very claim of jury prejudice because of media attention appearing
during a trial must turn on its own facts." Id. (citing Marshall v. United States, 360 U.S.
310, 312 (1959)).

 In this case, Jose's counsel moved for a mistrial at the punishment phase based
upon the Dewhurst commercial. He did not request an instruction from the trial court for
the jury to disregard the commercial. Kittleman testified that the commercial first aired on
October 20, 2004, the day after the jury convicted Jose, and that the commercial aired
thirty-eight times between October 20, 2004, and October 29, 2004. Kittleman further
testified that the commercial was aired during popular television shows, such as Dancing
With the Stars, Grey's Anatomy, and 20/20. Even though the commercial aired during the
broadcast of several popular television shows, the record does not demonstrate a
substantial likelihood that this commercial reached the jury. (5) See Ladner, 868 S.W.2d at
423. Furthermore, we question the prejudicial value of the commercial because Dewhurst
advocated for mandatory twenty-five-year sentences for convicted child molesters and the
jury assessed a maximum punishment of twenty years' incarceration. (6) See id. Moreover,
Jose has not demonstrated that the commercial impacted his ability to defend himself
during the guilt/innocence phase. See id. 

 Based on the record in this case, we conclude that a trial court's instruction to
disregard the commercial would have been sufficient to "cure" the prejudice of which Jose
complains. See Herbst, 941 S.W.2d at 377-78; see also Hawkins, 135 S.W.3d at 77;
Simpson, 119 S.W.3d at 272; Powell, 898 S.W.2d at 828. Thus, we hold that Jose's failure
to request an instruction to disregard in this instance waives his second issue. See Young,
137 S.W.3d at 69-70.

IV. Conclusion


 The judgment of conviction and sentence of the trial court is affirmed. 




 

 DORI CONTRERAS GARZA,

 Justice


Do not publish. 

Tex. R. App. P. 47.2(b).

Memorandum Opinion delivered and 

filed this the 14th day of May, 2009.
1. For ease of reference, any individual with the Lopez surname will be referred to by his or her first
name or by relationship with K.L. or Jose.
2. The guilt/innocence phase of this case was tried before a jury on October 17, 18, and 19, 2006. The
jury heard testimony from, among others, K.L., the complainant, K.L.'s family members, Jose's family
members, and a forensic scientist. Jose did not testify. Because the parties are familiar with the facts and
the legal issues are well settled, we outline a brief background that draws upon key testimony and is no longer
than necessary to advise the parties of the court's decision and the basic reasons for it. See Tex. R. App. P.
47.4. We will address additional, specific testimony where necessary.


3. K.L.'s mother testified that she placed the green shorts in a bag once K.L. gave them to her. She
explained the delay in giving the shorts to the police as being caused by her busyness with work and school.
Furthermore, K.L. stated that she could not remember which pair of underwear she was wearing on the date
of the incident; therefore, no underwear were sent to the police for testing.
4. In her report, Zavala noted that:


 [Jose] cannot be excluded as the contributor of the stain. The probability of selecting an
unrelated person at random who could be the source of this DNA profile [the sperm sample]
is approximately 1 in 9.940 quintillion for Caucasians, 1 in 5.974 quintillion for Blacks and 1
in 39.40 quintillion for Hispanics. To a certain degree of scientific certainty, [Jose] is the
source of the semen stain on the shorts (excluding identical twins). 
5. Jose did request that the jury be polled after the punishment phase; however, Jose did not request
the trial court to poll the jurors about the impact of the commercial on their deliberations as to Jose's sentence. 
6. The punishment range corresponding to the first-degree felonies was "for any term of not more than
99 years or less than 5 years." See Tex. Penal Code Ann. § 12.32 (Vernon 2003). Meanwhile, the
punishment range for the second-degree felony was "for any term of not more than 20 years or less than 2
years." See id. § 12.33 (Vernon 2003). Clearly, the maximum sentence imposed was at the lower end of the
first-degree-felony punishment range, thus tempering any notion that the contents of the commercial inflamed
the jury to enhance Jose's sentence. See id. § 12.32.