

# NUMBER 13-07-00127-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**JOSE MANUEL LOPEZ,**                                                              **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                              **Appellee.**

## On appeal from the 357th District Court of Cameron County, Texas.

# MEMORANDUM OPINION

### Before Justices Rodriguez, Garza, and Benavides
### Memorandum Opinion by Justice Garza

A jury convicted appellant, Jose Manuel Lopez,[1] of two first-degree felony counts

of aggravated sexual assault of a child and one second-degree felony count of indecency

with a child, and it assessed as punishment three terms of confinement for twenty, eight-

and-one-half, and four years for each count, respectively.  *See* TEX. PENAL CODE ANN. §

21.11 (Vernon 2003), § 22.021 (Vernon Supp. 2008).  The trial court signed a judgment

---

[1] For ease of reference, any individual with the Lopez surname will be referred to by his or her first
name or by relationship with K.L. or Jose.

of conviction and sentence according to the jury's verdict and assessment and ordered the imposed sentences to run concurrently. By two issues, Jose contends that: (1) the evidence is factually insufficient to support his conviction; and (2) the trial court abused its discretion by denying his motion for a mistrial at punishment based upon mid-trial publicity. We affirm.

## I. BACKGROUND[2]

### A. Before the Alleged Incident

K.L. is the daughter of Jose's brother. Although her mother and father were married when the incident occurred, the couple had been separated for years and informally shared custody of K.L. During the school year, K.L. lived with her mother in Baytown, Texas, and she spent summers with her father and her paternal family members in Brownsville, Texas. In February 2004, K.L., who was then thirteen years old, attempted to run away with her boyfriend. K.L.'s mother immediately sent K.L. to live with her father because she wanted to keep K.L. away from her boyfriend.

At that time, K.L.'s father did not have an established residence. Therefore, her father asked Jose if he and K.L. could live with Jose and his wife, Tina Lopez, in their two bedroom, two bathroom condominium in Rancho Viejo, Texas. Jose and Tina obliged. K.L. was given her own bedroom in the condominium, and her father either slept on the couch in the living room or at his mother's house. After K.L. moved in with Jose and Tina, she enrolled in middle school. But, K.L. did not have many friends outside of Baytown and

---

[2] The guilt/innocence phase of this case was tried before a jury on October 17, 18, and 19, 2006. The jury heard testimony from, among others, K.L., the complainant, K.L.'s family members, Jose's family members, and a forensic scientist. Jose did not testify. Because the parties are familiar with the facts and the legal issues are well settled, we outline a brief background that draws upon key testimony and is no longer than necessary to advise the parties of the court's decision and the basic reasons for it. *See* TEX. R. APP. P. 47.4. We will address additional, specific testimony where necessary.

was not involved in extracurricular activities when she lived in Rancho Viejo. K.L. missed Baytown and frequently telephoned her mother, boyfriend, and A.C., her cousin.

## B.     The Alleged Incident

K.L. testified that on the morning of Friday, April 23, 2004, she woke up with a cold and told her father, Jose, and Tina that she was not feeling well and was going to stay home from school. K.L. went back to sleep, then woke up around 10 or 11 a.m. to find that her father and Tina had left. Jose offered K.L. "a penicillin pill," asked if she wanted to watch a movie in Jose and Tina's bedroom, and suggested that K.L. take a shower because she was feeling hot. K.L. testified that she showered, put on a pair of underwear, green athletic shorts, and a t-shirt, and went into Jose and Tina's bedroom to watch the movie. At first, K.L. watched the movie from the bed while Jose sat on a couch in the bedroom. K.L. stated that about ten minutes into the movie, Jose moved onto the bed, laid next to her, smelled her hair, and caressed her arms. K.L. further stated that Jose then put his hands underneath her shorts, inserted a finger into her vagina, and moved it. K.L. also stated that: (1) Jose put her hand on his penis; (2) she could feel through his clothes that it was hard; and (3) she moved her hand away. According to K.L., Jose then took off her shorts and underwear and his pants and inserted his penis into her vagina and "like, started humping me." When Jose stopped, he went into the bathroom. K.L. felt like she had "peed herself" and noted that when she felt her private area, she felt "really sticky." She put her shorts on and went into the kitchen. Shortly thereafter, K.L. encountered Jose, and he told her "don't tell anyone or I'm going to have to kill myself." Jose took the cordless telephone from the living room into his bedroom. K.L., therefore, could not call for help.

## C.    After the Alleged Incident

After the alleged incident, Tina returned home and then ran an errand with Jose and K.L.  When the three returned, K.L. asked Tina for permission to use the telephone, and K.L. called her boyfriend in Baytown, but he was not there.  That evening, K.L. called her mother, and the two spoke for only five minutes.  The next day, Jose and Tina left for Victoria, Texas, and K.L. spent Saturday and Sunday with her father and Omar Rodriguez, a family friend.  At 2:30 a.m. on Sunday, April 25, 2004, K.L. again attempted to call her boyfriend, but instead, spoke to her boyfriend's sister, whom K.L. knew as a friend.  K.L. told her boyfriend's sister about the alleged incident.   Later on Sunday morning, K.L. recounted the alleged incident to A.C. and K.L.'s aunt.

On Sunday, April 25, 2004, K.L.'s aunt relayed K.L.'s allegations to K.L.'s mother, who then telephoned K.L.  After speaking with K.L., her mother asked her father to put K.L. on a plane to Houston, Texas.  Around 9 or 10 p.m. that evening, K.L. arrived in Houston, and according to her mother, she looked "scared" and "kind of nervous."  K.L.'s mother took K.L. to a Houston area hospital, where K.L. was examined by a physician, had a rape kit performed, and gave a videotaped interview to a forensic interviewer.

At approximately 1 a.m. the next day, K.L.'s mother spoke to a Rancho Viejo patrol officer.  The officer advised her to save any clothing that K.L. might have worn during the incident and send it to the police department.  In August 2004, K.L.'s mailed a pair of green shorts to the police department that K.L. had allegedly worn on the day of the incident.[3]

Later, K.L. wrote a note stating the following:  "I want a [sic] 35 million to 2 say

---

[3] K.L.'s mother testified that she placed the green shorts in a bag once K.L. gave them to her.  She explained the delay in giving the shorts to the police as being caused by her busyness with work and school. Furthermore, K.L. stated that she could not remember which pair of underwear she was wearing on the date of the incident; therefore, no underwear were sent to the police for testing.

4

nothin happen [sic]." At trial K.L. explained that:

| | |
|---|---|
| A. | I was in the car with my dad and he was telling me that [Jose's] lawyers was [sic] asking him to convince me to just say—write a note or write a letter to say nothing happened. The other lawyers, not you all, I don't think. I don't know. |
| | And I was like—like, he kept harassing me about it saying that I needed to write it down. I need to write it down, when I was going to write it down and? [sic] The day he came to see me in, I don't know, this last—I think it was around December or January, he told me that [Jose's] lawyers was [sic] going to take—clear my record and that they were going to—what, they were going to give me money or something if I wrote down somewhere that I said nothing happened. |
| Q. [Defense counsel] | So you're saying that your dad . . . made you write that? |
| A. | Yes. |
| Q. | Okay, but my question still was: After you wrote it, what did you do with it? |
| A. | He [her father] got it. I had wrote it on the middle thing of the truck, like the—that thing that comes up and down. And I left—after I finished writing it, he got it and put it in his pocket. |
| . . . . | |
| A. | Well, because I already knew that that wasn't going to be able to stop it because the State had already picked up the case. It wasn't up to me if I say that it's going to drop automatically. So I was just saying—I just wrote that so he could get off my back about it and leave me alone. |

Both K.L. and her mother testified that K.L.'s father rarely visited K.L., and K.L.'s mother stated that K.L.'s father pressured her to drop the charges against Jose.

5

**D.      Forensic Evidence**

After the Rancho Viejo police department received the green shorts, the item was sent to a Department of Public Safety (DPS) laboratory for analysis.  Edna Zavala, a DPS forensic scientist, testified that she performed a polylight test on the inside of the shorts, and the test did not reveal any semen stains.  Zavala then tested the crotch area for acid phosphatase, a chemical commonly found in semen.  Acid phosphatase was detected on a portion of the crotch area.

Next, Zavala ran a DNA profile on samples collected from the crotch area of the green shorts and determined that it contained epithelial cells from K.L. and sperm cells from an unknown male.  Rancho Viejo police obtained a search warrant for a sample of Jose's blood, successfully collected a sample, and forwarded it to the DPS laboratory.  Zavala testified that "[t]he DNA profile obtained from the sperm cell fraction of the semen stain on the [green] shorts is consistent with the DNA profile of [Jose].  [Jose] cannot be excluded as the contributor of the stain."[4]  However, on cross examination, Zavala admitted that the "stains" she described were not visible to the naked eye and that a concentrated stain on a pair of shorts would be diluted by washing the shorts.

**E.      Jose's Defense**

Omar, Tina, and Ninfa Leticia Lopez, Jose's sister-in-law, testified that K.L. appeared "fine" in the hours and days after the alleged incident.  Tina testified that K.L. seemed sad when she lived with her and Jose because she had no friends in Rancho Viejo

---

[4] In her report, Zavala noted that:

[Jose] cannot be excluded as the contributor of the stain.  The probability of selecting an unrelated person at random who could be the source of this DNA profile [the sperm sample] is approximately 1 in 9.940 quintillion for Caucasians, 1 in 5.974 quintillion for Blacks and 1 in 39.40 quintillion for Hispanics.  To a certain degree of scientific certainty, [Jose] is the source of the semen stain on the shorts (excluding identical twins).

6

and missed her boyfriend in Baytown.

Tina's testimony directly or indirectly contradicted K.L.'s testimony in that Tina testified to the following: (1) on the afternoon of Friday, April 23, 2004, Tina, Jose, and K.L. did not leave the house to run errands, but instead, went to a family member's house for dinner; (2) K.L. had a telephone in her bedroom that she could freely use; (3) on Saturday, April 24, 2004, K.L. wanted to accompany Jose and Tina to Victoria, Texas; (4) Tina did all the housework, including the laundry, and K.L. did not do very much housework; and (5) the Rancho Viejo Police Station was within one hundred feet of the condominium. Tina further testified that on the morning of the alleged incident, she performed oral sex on Jose before discovering that K.L. had stayed home from school. At a different point in Tina's testimony, she stated that she would clean off Jose's semen with a wet towel, which she put in the household's laundry basket and which was washed with the rest of the household's dirty laundry, including K.L.'s clothing.

## F.    Post-Verdict Motion and Punishment

The jury charge contained two first-degree felony counts of aggravated sexual assault of a child and one second-degree felony count of indecency with a child. *See id.* §§ 21.11, 22.021. On October 19, 2004, the jury found Jose guilty on all counts. The trial court accepted the jury's verdict and set the punishment phase of trial for October 30, 2004.

At the punishment phase of trial, Jose's counsel orally moved for "a mistrial at punishment" on the ground that publicity would adversely affect the jury's assessment. Specifically, Jose pointed out that David Dewhurst, a candidate for lieutenant governor, ran a television commercial publicizing his support for "Jessica's Law," a legislative measure

that imposed mandatory twenty-five-year prison terms for individuals convicted of child molestation (hereinafter "the Dewhurst commercial"). John Wesley Kittleman, general manager of an ABC television affiliate, testified that the commercial aired thirty-eight times on his station between October 20 and October 29, 2004. The trial court denied Jose's motion.

During the punishment phase of trial, the State called: (1) D.S., a woman who claimed Jose raped her in 1977; (2) N.J., a woman who claimed she had sexual relations with Jose when she was fourteen years old and gave birth to his child; (3) Officer Loray Taylor, a San Marcos police officer who claimed Jose was arrested on marihuana possession charges in 2001; and (4) Chris Lawrence, a patrol deputy with the Kleberg County Sheriff's Department who arrested Jose for illegal possession of marihuana after pulling Jose over for various traffic violations on November 14, 1995. Jose did not testify, but he called two of his children and Belinda Guerra, a longtime family friend, to testify as to his good nature. The jury assessed as punishment three terms of confinement for twenty, eight-and-one-half, and four years for each count, respectively. The trial court signed a judgment of conviction and sentence according to the jury's verdict and assessment. The trial court certified Jose's right to appeal on February 21, 2007. This appeal ensued.

## II. FACTUAL SUFFICIENCY

In his first issue, Jose challenges the factual sufficiency supporting his conviction. Specifically, Jose contends that: (1) K.L.'s testimony was not credible because she fabricated the alleged incident in order to return home and because she requested $35 million in exchange for dropping the charges against Jose; (2) Tina's testimony regarding

8

her sex life with Jose and the disposal of Jose's semen greatly outweighed the forensic evidence supporting Jose's conviction; and (3) Ninfa's, Rodriguez's, and Tina's testimony about K.L.'s demeanor after the alleged incident further outweighed K.L.'s testimony. Jose argues that for the forgoing reasons, the jury's determination of guilt is manifestly unjust.

## A. Standard of Review

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Neal v. State*, 256 S.W.3d 264, 275 (Tex. Crim. App. 2008); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact finder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact finder's determination is manifestly unjust. *Lancon v. State*, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008); *Watson*, 204 S.W.3d at 414-15, 417. To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court "harbor a subjective level of reasonable doubt to overturn [the] conviction." *Id*. We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury's resolution of a conflict in the evidence. *Id*. We may not simply substitute our judgment for the fact finder's. *Johnson v. State*, 23 S.W.3d 1, 12 (Tex. Crim. App. 2000); *Cain v. State*, 958

S.W.2d 404, 407 (Tex. Crim. App. 1997). Unless the record clearly reveals that a different result is appropriate, we must defer to the jury's determination of the weight to be given contradictory testimonial evidence because resolution of the conflict "often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered." *Johnson*, 23 S.W.3d at 8. Thus, unless we conclude that it is necessary to correct manifest injustice, we must give due deference to the fact finder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Id*. at 9. Our deference in this regard safeguards the defendant's right to a trial by jury. *Lancon*, 253 S.W.3d at 704.

**B.    Analysis**

First, Jose contends that K.L.'s testimony is not credible because she wished to return to Baytown and her boyfriend, and she fabricated the allegations against Jose in order to return. As evidence of K.L.'s duplicity, Jose points to the testimony of Rebecca Girardet, M.D., a pediatrician at the Children's Assessment Center who performed a rape kit examination on K.L. On cross examination by Jose's counsel, Dr. Girardet testified that K.L. did not tell her that Jose ejaculated inside her or that "something came out." At trial, however, K.L. testified that when Jose stopped the assault, she felt like she had "peed herself" and noted that she felt "really sticky."

Jose also argues that K.L.'s note demanding $35 million in exchange for dropping the charges undermines the "veracity of her allegations." However, K.L. testified that her father pressured her to write the note. In addition, K.L.'s mother corroborated K.L.'s testimony about K.L.'s father's insistence that the charges against Jose be dropped.

Second, Jose contends that the DNA evidence presented by the State does not

10

"shore up" K.L.'s testimony. Jose highlights Tina's testimony that: (1) she and Jose enjoyed a vibrant sex life; (2) she customarily cleaned up Jose's ejaculate with a towel and threw the towel in the household's laundry pile; and (3) she washed all of the household's laundry together. Jose posits that his DNA transferred onto the shorts that were tested while they were in the laundry together. Additionally, Jose contends that the DNA evidence should be discounted because neither K.L.'s mother nor K.L. adequately explained why the shorts were not turned over to the police department until August 2004, even though the incident allegedly occurred in April 2004. On the other hand, K.L. testified that she did her own laundry and never washed her clothes with Jose's clothes. Regarding the delay in sending the shorts to the police, K.L.'s mother explained on cross examination by Jose's counsel that she was very busy. We note that Jose did not present any positive testimony regarding his "DNA transfer theory," and that the bulk of the theory was advanced or suggested by questions from Jose's counsel to Zavala.

Third, Jose notes that several defense witnesses testified that K.L. appeared "fine" after the alleged incident and that K.L. wanted to accompany him and Tina to Victoria, Texas, the day after the incident. He contends that these two pieces of evidence contradict K.L.'s trial testimony and outweigh the evidence supporting his conviction. K.L., however, testified as to the incident and K.L.'s mother testified that K.L. looked "scared" and "kind of nervous" when she first saw her after the alleged incident.

All of Jose's factual sufficiency arguments touch on the jury's role as the fact finder. The jury is the sole judge of the weight and credibility of the evidence and is entitled to resolve conflicts in the evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 36.13 (Vernon 2007); *Johnson*, 23 S.W.3d at 7. The jury was thus entitled to: (1) weigh K.L.'s trial

11

testimony over her interview with Dr. Girardet regarding the incident and whether Jose ejaculated; (2) weigh the significance of K.L.'s note demanding $35 million in exchange for dropping the charges against Jose over testimony indicating K.L.'s father's pressuring of K.L. and K.L.'s mother to drop the charges; (3) disbelieve the "DNA transfer theory"; and (4) disbelieve the defense witnesses regarding K.L.'s demeanor in light of K.L's testimony about the incident and K.L.'s mother's testimony about K.L.'s demeanor after the alleged incident.

After considering Jose's contentions and the evidence as a whole, we cannot say that it is so weak or that the conflicting evidence so greatly outweighs the evidence supporting the conviction that the jury's verdict was clearly wrong and manifestly unjust. *Lancon*, 253 S.W.3d at 704; *Watson*, 204 S.W.3d at 414-15, 417.  Accordingly, we hold that the evidence is factually sufficient to support Jose's conviction, and we overrule Jose's first issue.

### III. MOTION FOR MISTRIAL

In his second issue, Jose contends that the trial court erred in denying his motion for a mistrial at the punishment phase because the Dewhurst commercial was aired by a local television station and there was a high probability that it influenced the jury and denied him a fair trial.  The State contends that Jose waived his second issue by not requesting an instruction from the trial court.  We agree.

To preserve error for appellate review, an appellant must raise the complaint in the trial court in a timely request, objection, or motion stating the grounds for the objection. TEX. R. APP. P. 33.1(a).  The usual sequence for pursing an objection to an adverse ruling is (1) objection, (2) instruction to disregard, and (3) motion for mistrial, but:

12

this sequence is not essential to preserve complaints for appellate review. The essential requirement is a timely, specific request that the trial court refuses. . . .  Similarly, the request for an instruction that the jury disregard an objectionable occurrence is essential only when the [sic] such an instruction could have had the desired effect, which is to enable the continuation of the trial by a [sic] impartial jury.  *The party who fails to request an instruction to disregard will have forfeited appellate review of that class of events that could have been "cured" by such an instruction.*  But if an instruction could not have had such an effect, the only suitable remedy is a mistrial, and a motion for a mistrial is the only essential prerequisite to presenting the complaint on appeal. . . .  Accordingly, when a party's first action is to move for mistrial . . . the scope of appellate review is limited to the question whether the trial court erred in not taking the most serious action of ending the trial; in other words, an event that could have been prevented by timely objection or cured by instruction to the jury will not lead an appellate court to reverse a judgment on appeal by the party who did not request these lesser remedies in the trial court.  Limited as this scope of appellate review may be, such an appellate review is available to such a party.

*Young v. State*, 137 S.W.3d 65, 69-70 (Tex. Crim. App. 2004) (emphasis added) (footnotes omitted).

In most cases, a trial court's instruction to disregard any outside information concerning the trial is sufficient to ensure a fair trial.  *Herbst v. State*, 941 S.W.2d 371, 377-78 (Tex. App.–Beaumont 1997, no pet.) (citing *Powell v. State*, 898 S.W.2d 821, 828 (Tex. Crim. App. 1994) ("A presumption of prejudice does not arise simply because a case has been publicized in the media . . . .")).  Only extreme circumstances, when the prejudice is incurable, require a mistrial.  *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (citing *Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003) ("The trial court is required to grant a motion for a mistrial only when the improper [action] is clearly prejudicial to the defendant and is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors.")).

In *Ladner v. State*, the Tyler Court of Appeals held that in determining whether

13

outside news media information is possibly prejudicial, the trial court must: (1) "look at the nature of the news material in question to determine whether it is innately prejudicial; factors such as the timing of the media coverage and its possible effects on legal defenses are to be considered"; and (2) "ascertain the likelihood that the publicity has in fact reached the jury." 868 S.W.2d 417, 423 (Tex. App.–Tyler 1993, pet. ref'd). The *Ladner* court further noted that "[e]very claim of jury prejudice because of media attention appearing during a trial must turn on its own facts." *Id.* (citing *Marshall v. United States*, 360 U.S. 310, 312 (1959)).

In this case, Jose's counsel moved for a mistrial at the punishment phase based upon the Dewhurst commercial. He did not request an instruction from the trial court for the jury to disregard the commercial. Kittleman testified that the commercial first aired on October 20, 2004, the day after the jury convicted Jose, and that the commercial aired thirty-eight times between October 20, 2004, and October 29, 2004. Kittleman further testified that the commercial was aired during popular television shows, such as *Dancing With the Stars*, *Grey's Anatomy*, and *20/20*. Even though the commercial aired during the broadcast of several popular television shows, the record does not demonstrate a substantial likelihood that this commercial reached the jury.[5] *See Ladner*, 868 S.W.2d at 423. Furthermore, we question the prejudicial value of the commercial because Dewhurst advocated for mandatory twenty-five-year sentences for convicted child molesters and the jury assessed a maximum punishment of twenty years' incarceration.[6] *See id.* Moreover,

---

[5] Jose did request that the jury be polled after the punishment phase; however, Jose did not request the trial court to poll the jurors about the impact of the commercial on their deliberations as to Jose's sentence.

[6] The punishment range corresponding to the first-degree felonies was "for any term of not more than 99 years or less than 5 years." *See* TEX. PENAL CODE ANN. § 12.32 (Vernon 2003). Meanwhile, the punishment range for the second-degree felony was "for any term of not more than 20 years or less than 2 years." *See id.* § 12.33 (Vernon 2003). Clearly, the maximum sentence imposed was at the lower end of the

14

Jose has not demonstrated that the commercial impacted his ability to defend himself during the guilt/innocence phase. *See id.*

Based on the record in this case, we conclude that a trial court's instruction to disregard the commercial would have been sufficient to "cure" the prejudice of which Jose complains. *See Herbst*, 941 S.W.2d at 377-78; *see also Hawkins*, 135 S.W.3d at 77; *Simpson*, 119 S.W.3d at 272; *Powell*, 898 S.W.2d at 828. Thus, we hold that Jose's failure to request an instruction to disregard in this instance waives his second issue. *See Young*, 137 S.W.3d at 69-70.

## IV. CONCLUSION

The judgment of conviction and sentence of the trial court is affirmed.

_____
DORI CONTRERAS GARZA,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).
Memorandum Opinion delivered and
filed this the 14th day of May, 2009.

---

first-degree-felony punishment range, thus tempering any notion that the contents of the commercial inflamed the jury to enhance Jose's sentence. *See id.* § 12.32.

15